UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

ALLIANZ SUISSE
VERSICHERUNGS-GESELLSCHAFT,

       Plaintiff,                            Case No. 1:12-CV-1250

v.                                            HON. GORDON J. QUIST

KEVIN MILLER,

       Defendant.
_____/

**OPINION**

**INDEX**

I. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     The National League Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.     The Criminal Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     C.     The Criminal Appeals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     D.     The Civil Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.     Repugnant to Public Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.     Compatibility with Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLIANZ SUISSE
VERSICHERUNGS-GESELLSCHAFT,

        Plaintiff,                                    Case No. 1:12-CV-1250

v.                                          HON. GORDON J. QUIST

KEVIN MILLER,

        Defendant.
                                       /

**OPINION**

      Plaintiff, Allianz Suisse Versicherungs-Gesellschaft, a Swiss insurance company, as subrogee of Andrew McKim, has sued Defendant, Kevin Miller, seeking recognition and enforcement of a foreign country judgment pursuant to the Uniform Foreign-Country Judgments Recognition Act, M.C.L.A. § 691.1131, *et seq*. In particular, Allianz seeks to enforce a Judgment it obtained against Miller in the District Court of Zurich, Switzerland on March 29, 2010. Zurich has filed a motion for summary judgment requesting entry of an order recognizing the Judgment as conclusive between the parties and enforceable in Michigan. In response, Miller has filed his own motion for summary judgment, arguing that the Court should decline to recognize the Judgment because it is contrary to the public policy of the State of Michigan and violative of the requirements of due process of law.

      For the reasons stated in this Opinion, the Court will grant Allianz's motion, deny Miller's motion, and enter an order recognizing the Judgment as valid and enforceable under Michigan law.

# I. BACKGROUND

Miller, a citizen of the United States and the State of Michigan, is and a former professional hockey player. During the 2000-01 season, Miller played for HC Davos in the Switzerland National Hockey League. On October 31, 2000, during a game with the ZSC Lions, Miller "checked" Lions player McKim from behind after McKim took a shot, hitting McKim in the head and neck. (Dkt. # 40-2 at Page ID 397.) As a result, McKim fell and hit his head on the ice. McKim suffered a non-localized concussion and other injuries, and was hospitalized for several weeks. Miller received a five-minute penalty and a playing-time disciplinary penalty. (Dkt. # 1-3 at Page ID 9–10.)

## A.   The National League Proceedings

Following the incident, at the request of the ZSC Lions, the National League Tribunal commenced proceedings to review whether further disciplinary action should be imposed against Miller. (*Id.* at Page ID 10.) On November 15, 2000, the single judge assigned to review the incident determined that Miller violated IIHF Regulation 603 (intentional or potentially malicious injury or attempted injury) and imposed an eight game suspension and a fine. HC Davos appealed the ruling, but the appeal was rejected by the Appeals Chamber of the National League on December 16, 2000. (*Id.*) Miller was not a party to the National League Tribunal proceedings, and the Tribunal did not interview him or ask him questions. (Dkt. # 45-2 at Page ID 585, ¶ 9.) HC Davos essentially controlled the proceedings, and its primary concern was concluding them in an expeditious manner so that Miller could resume playing before the playoffs. (*Id.* ¶¶ 10–11.) At the insistence of the President of HC Davos, Miller waived his appeal of the Tribunal's decision. (*Id.* ¶ 12.) At the time, Miller was unaware that the Tribunal's decision could be used against him subsequently in criminal or civil proceedings. (*Id.* ¶ 13.)

B.     The Criminal Proceedings

On December 10, 2004, the Public Prosecutor's Office Division IV of the Canton of Zurich charged Miller criminally with malicious simple bodily injury and grievous bodily injury. The Zurich court invited Miller and his attorney to review the video recordings of the October 31, 2000 incident. (Dkt. # 41-1 at Page ID 491.) Prior to trial, Miller's counsel viewed the recordings and furnished slow motion images to the court. (*Id.*) The trial was held August 29, 2005. Miller attended the trial and was permitted to testify. Miller admitted that he checked McKim, injuring him "at least lightly," but denied that his actions resulted in the serious injuries that McKim sustained when he hit his head on the ice. (*Id.* at Page ID 493.) The court requested expert opinions from two independent sources, Gerhard Müller, who evaluated the video, and Dr. med. R. Agosti, a medical expert who opined on the injuries that McKim sustained and the causal relationship of the "check" to the injuries. Both of the independent experts submitted reports to the court. Although Miller's counsel was not permitted to examine the independent experts, the court rules permitted Miller's counsel to submit written questions to Gerhard Müller and Dr. Agosti requesting clarification of their opinions. (Dkt. # 41 at Page ID 477.) Miller's counsel sent written questions to Dr. Agosti. (*Id.*) It is unclear whether Miller's counsel also sent written questions to Gerhard Müller.[1] Miller submitted opinions from his own experts, including Klaus Schilling, who answered the same questions as independent expert Gerhard Müller, and Brian P. Burke, the President and General Manager of the Vancouver Canucks. (Dkt. # 41 at Page ID 474–75, ¶ 20; dkt. # 41-3 at Page ID 512–17.)

---

[1] In support of its motion, Allianz presented evidence that Miller's counsel had the opportunity to send written questions to Gerhard Müller but did not do so. (Dkt. # 41 at Page ID 477, ¶ 35.) At oral argument on the instant motions, however, Miller's counsel maintained that Miller's Swiss counsel did send written questions to Gerhard Müller. Whether Miller's counsel sent questions to Gerhard Müller is not material to the Court's analysis.

On September 20, 2005, the criminal court issued a 36-page decision finding Miller guilty of simple bodily harm, intentional bodily harm, and gross negligence. The court also found Miller 100 percent responsible for McKim's injuries. (Dkt. # 41 at Page ID 475, ¶ 21.) In explaining its decision, the criminal court accepted expert Gerhard Müller's testimony as consistent with the video evidence and concluded that Miller could and should have avoided the collision but instead intended to deliver the blow to McKim. (Dkt. # 41-1 at Page ID 499-500.) The court rejected Miller's account as not credible and disregarded the testimony of Miller's witnesses, including his experts, as biased or irrelevant.[2] (Dkt. # 41-2 at Page ID 502.)

### C. The Criminal Appeals

Miller appealed the guilty verdict to the Court of Appeals for the Canton of Zurich, which accepted Miller's legal analysis and interpretation of the evidence and found Miller not guilty. McKim then appealed the acquittal to the Swiss Federal Court (Switzerland's highest court). On October 24, 2007, the Federal Court reversed the Zurich Court of Appeals and remanded for reconsideration consistent with the Federal Court's October 24, 2007 decision. (Dkt. # 41 at Page ID 475–766.) Following the remand, the Court of Appeals issued a 31-page decision on April 3, 2008, finding Miller guilty of criminal minor bodily harm and criminal negligent bodily harm and determining that Miller was 100 % liable for McKim's injuries. (Dkt. # 1-3 at Page ID 91.) In reaching its decision, the Court of Appeals relied on details and information that Miller provided, as well as the expert opinions of Miller's experts, Schilling and Burke. The court rejected independent expert Gerhard Müller's conclusion that Miller acted out of frustration. (Dkt. # 40-4 at Page ID 448, 453.) The court concluded that Miller did not act with direct intent to injure

---

[2] The criminal court imposed three months' imprisonment but suspended the sentence in favor of two years of probation. (Dkt. # 40-2 at Page ID 418.)

4

McKim, but did act with "contingent intent" in disregarding the risk associated with checking someone from the rear. (*Id.*) Miller did not appeal the Court of Appeals' decision within 30 days, as permitted by Swiss law.[3]

### D. The Civil Case

Allianz, which insured McKim, filed a separate civil action against Miller in the District Court of Zurich to establish monetary damages for payments it had made to McKim for past, present and future medical expenses, wage loss, and other amounts Allianz was required to pay under Swiss law.[4] Miller was represented by the same attorney who represented him in the criminal proceedings, as well as an additional attorney whom Miller retained for the civil proceedings. Miller's counsel offered substantially the same evidence in support of his defense that was presented in the criminal proceeding. Miller could have requested the civil court to allow him to testify at the civil trial, but Miller did not make such a request. In fact, he did not attend the civil trial. (Dkt. # 41 at Page ID 478.)

The civil court issued the 69-page Judgment at issue in this case on March 17, 2010. The judge[5] recognized that he was not bound by the criminal finding of guilt, but instead was obligated to take a fresh look at the issues of culpability and damages. (Dkt. # 1-3 at Page ID 91.) The judge rejected Miller's assertion that he was liable for the "check" only and not the resulting loss of consciousness and injuries that McKim sustained when he hit his head on the ice, reasoning that they were "precisely typical consequences of such conduct." (*Id.* at Page ID 122.) In concluding that

---

[3] The Court of Appeals did not reinstate the sentence imposed by the criminal court.

[4] Under Swiss law, a defendant's criminal and civil liability are generally determined by the criminal court in a single proceeding, but the issue of monetary compensation is determined in a separate civil proceeding. (Dkt. # 41 at Page ID 477-78.)

[5] It is unclear to the undersigned whether this District Court of Zurich had one or more than one judge.

Miller was responsible for the damages resulting from the "check," the judge observed that Miller must have recognized that he could not have made a legal body check on McKim, that Miller had sufficient time to avoid the improper contact with McKim, and that Miller must have known of the risk that he could inflict serious injury on McKim with contact from behind. (*Id.* at Page ID 126.) The judge relied, in part, on the expert opinion of Gerhard Müller and explained that he viewed the opinion by Miller's expert, Burke, with skepticism because it was a "biased valuation report" and was contrary to assessments by other appeals bodies, including the single judge and the appeals tribunal of the National League. (*Id.* at Page ID 43–44.) The judge also cited the video evidence, which "clearly show[ed] that [Miller] could recognize that it was no longer possible to prevent [McKim] from taking the shot, and certainly not by means of a regular body check," and that Miller "readily had the option to turn around, and thereby prevent the collision." (*Id.* at Page ID 44.) The Judgment was in the amount of one million Swiss Francs (as of June 4, 2014, CF 1,000,000 equals approximately $1,115,681), plus interest at the rate of five percent from March 1, 2003, court costs of sixty-one thousand five hundred Swiss Francs, court disbursements of five hundred fifty Swiss Francs, and attorney fees and costs of sixty-two thousand eight hundred Swiss Francs. Miller did not appeal the Judgment, and it became enforceable on April 9, 2010.

## II. Discussion

In a diversity action for recognition of a foreign country judgment, the court must apply state law. *See Success Motivation Inst. of Japan Ltd. v. Success Motivation Inst., Inc.*, 966 F.2d 1007, 1009 (5th Cir. 1992); *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 686 (7th Cir. 1987) (noting that the question of recognition and enforcement of a Belgian judgment was to be resolved under Illinois law). In this case, the Court applies the Uniform Foreign-Country Money Judgments Recognition Act (FCMJRA), which Michigan has adopted. The FCMJRA applies to foreign-

6

country judgments that grant or deny recovery of a sum of money and that are final, conclusive, and enforceable under the law of the foreign country.[6] M.C.L.A. § 691.1133(2).

Section 4 of the FCMJRA, which sets forth the grounds for recognition and non-recognition, provides in pertinent part:

> (1) Except as otherwise provided in subsections (2) and (3), a court of this state shall recognize a foreign-country judgment to which this act applies.
>
> (2) A court of this state shall not recognize a foreign-country judgment if any of the following apply:
>
> (a) The judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law.
>
> (b) The foreign court did not have personal jurisdiction over the defendant.
>
> (c) The foreign court did not have jurisdiction over the subject matter.
>
> (3) A court of this state need not recognize a foreign-country judgment if any of the following apply:
>
> . . . .
>
> (c) The judgment or the cause of action on which the judgment is based is repugnant to the public policy of this state or of the United States.
>
> . . . .
>
> (h) The specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law.
>
> (4) A party resisting recognition of a foreign-country judgment has the burden of establishing that a ground for nonrecognition stated in subsection (2) or (3) exists.

M.C.L.A. § 691.1134. The grounds set forth in subsection (2) mandate nonrecognition, while the

---

[6] The FCMJRA does not apply to a foreign-country money judgment that is for taxes, a fine or other penalty, or divorce, support, maintenance, or other domestic relations-related matter. M.C.L.A. § 691.1133(2). Miller concedes that the Judgment was not rendered for any of those purposes.

grounds set forth in subsection (3) are discretionary. *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 (2d Cir. 2012).

Allianz has met its burden of showing that the FCMJRA applies to the Judgment because it is undisputed that the Judgment awards a sum of money to Allianz and is final, conclusive, and enforceable under Swiss law. *See* M.C.L.A. § 691.1133(3) (a party seeking recognition of a foreign judgment has the burden of showing that the FCMJRA applies to the judgment). Miller does not dispute that the FCMJRA applies to the Judgment, nor does he assert that he was not subject to personal jurisdiction in the Swiss courts or that the Swiss courts lacked subject matter jurisdiction. Finally, Miller does not argue that Switzerland's judicial system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law."[7] M.C.L.A. § 691.1134(2)(a); *see Medoil Corp. v. Citicorp*, 729 F. Supp. 1456, 1460 (S.D.N.Y. 1990) ("Swiss courts are a fair and reasonable forum for resolution of disputes."). Miller contends, however, that the Court should decline to recognize the Judgment under the discretionary grounds that it is repugnant to the public policy of Michigan and the United States and that the proceeding giving rise to the Judgment was not compatible with the requirements of due process. M.C.L.A. § 691.1134(3)(c), (h).

### A. Repugnant to Public Policy

Establishing the public policy ground for nonrecognition of a foreign judgment is a difficult task. This doctrine is "rarely relied upon." *Tahan v. Hodgson*, 662 F.2d 862, 866 n.17 (D.C. Cir. 1981). "[F]ew judgments fall in the category of judgments that need not be recognized because they

---

[7] There is some question as to whether the proponent of the judgment to be recognized has the burden of proving that no mandatory basis for nonrecognition exists or whether the party opposing enforcement of the judgment must prove that such a basis exists. *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 278 n.269 (S.D.N.Y. 2012) (citing cases reaching different conclusions). The Court need not determine the issue conclusively, however, because there is no dispute that there is no basis for mandatory nonrecognition.

violate the public policy of the forum." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1003 (9th Cir. 2013) (internal quotation marks omitted). "It has long been the law that unless a foreign country's judgments are the result of outrageous departures from our own [n]otions of civilized jurisprudence, comity should not be refused." *Id.* (internal quotation marks omitted). "The standard is high, and infrequently met. . . . In the classic formulation, a judgment that 'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy." *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (quoting *Somportex v. Philadelphia Chewing Gum*, 453 F.2sd 435, 443 (3d Cir. 1971)); *see also Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 331–32 (5th Cir. 2002) (noting the requirement of a high level of contravention of Texas law to justify application of the public policy ground for nonrecognition). According to the commentary to the Uniform Act, the test is "stringent." Uniform Foreign-Country Money Judgments Recognition Act § 4, cmt. 8 at 12 (2005). A difference in law, "even a marked one," is not enough. *Id.* Instead,

> Public policy is violated only if the recognition or enforcement of the foreign-country judgment would tend to injure the public health, the public morals, or the public confidence in the administration of law, or would undermine "that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel."

*Id.* (quoting *Hunt v. BP Exploration Co. (Libya) Ltd.*, 492 F. Supp. 885, 901 (N.D. Tex. 1980)).

Miller contends that the Judgment is repugnant to the public policy of Michigan and the United States because he was denied the right of confrontation in the Swiss proceedings and because the Judgment relies on the decision rendered in the National League hockey proceeding, to which Miller was not a party.[8] Neither argument meets the stringent standard set forth above.

---

[8] Miller does not argue that the Swiss cause of action is repugnant to public policy.

9

Miller contends that he was denied the right of confrontation because he was not permitted to confront the independent expert, Gerhard Müller, who opined about Miller's intent at the time of the incident. Miller contends that denial of the opportunity to cross-examine Gerhard Müller was detrimental to his defense because Gerhard Müller's report, which concluded that Miller acted with the intent to injure McKim, provided the basis for both criminal and civil liability. As Miller's counsel conceded at oral argument, however, the right of confrontation is a right that applies only in criminal cases. *See Austin v. United States*, 509 U.S 602, 608 & n.4, 113 S. Ct. 2801, 2804 & n.4 (1993). Miller argues, however, that the right of confrontation pertains to the specific circumstances of this case because Miller's civil liability was determined in a criminal proceeding—in which the right of confrontation would be available in a United States court—and there is no way to extricate his civil from his criminal liability.

The simple answer is that Allianz is not asking the Court to recognize a criminal judgment. Instead, the Judgment is a civil judgment, rendered at the conclusion of a separate civil proceeding, that does not impose a fine or penalty that may be considered criminal in nature. Although the judge in the civil proceeding acknowledged and considered the Swiss criminal proceedings, the Swiss civil proceeding displayed all of the hallmarks of fundamental fairness. Miller was represented by counsel and was permitted to present evidence and make arguments to the court. Moreover, the civil judge's exhaustive Judgment reveals that the civil judge considered all of the evidence, including the video evidence of the hit, addressed the arguments that Miller raised, and gave cogent reasons for his decision.

As noted above, Miller was not totally deprived of the opportunity to flesh out the basis for Gerhard Müller's opinion. Miller had the opportunity to submit written questions to Gerhard Müller regarding his opinion. While Miller, no doubt, would have preferred to cross-examine Gerhard

10

Müller, "the [FCMJRA] does *not* require that the procedures employed by the foreign tribunal be *identical* to those employed in American courts." *Ingersoll Milling Mach. Co.*, 833 F.2d at 687 (italics in original); *see also Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 994 (10th Cir. 2005) ("The procedures the English courts afford need not be identical to ours, they must only be compatible in that they do not offend the notion of basic fairness."). "[A] mere difference in the procedural system is not a sufficient basis for nonrecognition." Uniform Foreign-Country Money Judgments Recognition Act § 4, cmt. 5 at 10. In *Hilton v. Guyot*, 159 U.S. 113, 16 S. Ct. 139 (1895)—the seminal case in the area of foreign judgments—the Court stated that it was "not prepared to hold that the procedure [of the foreign country court] differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment." *Id.* at 205, 16 S. Ct. at 159. In the French proceeding at issue in *Hilton*, one of the plaintiffs was permitted to testify under oath and was not subjected to cross-examination by the defendant, and documents and papers having no connection to the defendants—which would not have been admissible in the United States system of justice—were admitted. Because "the practice followed and the method of examining witnesses were according to the laws of France," the Court found no basis for nonrecognition. *Id.* at 204–05, 16 S. Ct. at 159. In this case, Miller concedes that Swiss law does not allow for cross-examination of expert witnesses. Thus, as *Hilton* teaches, the unavailability of cross-examination in Swiss courts is a mere difference in procedure that does not trigger the public policy exception. *See Loucks, ex rel. Loucks v. Standard Oil Co. of N.Y.*, 224 N.Y. 99, 111, 120 N.E. 198, 201 (1918) ("We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.") (Cardozo, J.).

*Bachchan v. India Abroad Publications, Inc.*, 154 Misc. 2d 228, 585 N.Y.S. 2d 661 (1992), which Miller cites as supporting his argument, is inapposite to this case. The plaintiff in *Bachchan*

11

sought recognition of an English libel judgment. The court refused to enforce the judgment because English law lacks the protections afforded by the First Amendment. In particular, the court noted that English law requires the defendant to prove the truth of the allegedly defamatory statements, does not distinguish between matters of public and private concern, and requires no showing of fault in any degree. 154 Misc. 2d at 234, 585 N.Y.S.2d at 664–65. The court observed that "[t]he protection of free speech and the press embodied in [the First Amendment] would be seriously jeopardized by the entry of foreign libel judgments granted pursuant to standards deemed appropriate in England but considered antithetical to the protections afforded the press by the U.S. Constitution." *Id.* at 235, 585 N.Y.S. 2d at 665. The same cannot be said here. There is no indication that the substantive Swiss law, including burdens of proof, was so at odds with domestic legal principals that it was "antithetical to the protections afforded . . . by the U.S. Constitution." In fact, having read the Swiss civil court's analysis of the facts and law, the Court notes that it is substantially similar to what would occur in a bench trial in the United States.

      Miller also argues that the Judgment is repugnant to the public policy of Michigan because it relies on the National League hockey proceeding to which Miller was not granted status as a party. Specifically, Miller contends that use of the National League proceeding to establish his liability is contrary to notions of fundamental fairness embodied in preclusion doctrines, such as collateral estoppel, that preclude use of determinations made in prior proceedings against a person who was not a party in the prior proceeding. This Court disagrees because the Swiss civil court did not accord preclusive effect to the National League proceeding that determined that Miller intentionally injured McKim. Rather, the Swiss court considered the hockey tribunal's determination along with the other evidence presented, including the video evidence, and drew its own conclusions. Moreover, Miller admits that he waived his appeal of the hockey tribunal's decision, and nothing

prevented him from obtaining counsel for advice on the consequences of waiving the appeal or whether he should intervene in the proceeding. Finally, Miller chose not to attend and participate in the civil trial, and there is no indication that his counsel raised this issue with the civil court. *See Ingersoll Milling Mach. Co.*, 833 F.2d at 687 ("[G]iven that there were no witnesses, due at least in part to Ingersoll's own tactical decision, Ingersoll cannot point to the lack of cross-examination as a violation of due process."). Thus, the Swiss court's consideration of the hockey tribunal decision in the civil trial was not repugnant to Michigan public policy.

  **B.**  **Compatibility with Due Process**

Subsection 4(c)(8) of the FCMJRA focuses on due process in "[t]he specific proceeding."

> While the focus of subsection 4(b)(1) is on the foreign country's judicial system as a whole, the focus on subsection 4(c)(8) is on the particular proceeding that resulted in the specific foreign-country judgment under consideration. Thus, the difference is that between showing, for example, that there has been such a breakdown of law and order in the particular foreign country that judgments are rendered on the basis of political decisions rather than the rule of law throughout the judicial system versus a showing that for political reasons the particular party against whom the foreign-country judgment was entered was denied fundamental fairness in the particular proceedings leading to the foreign-country judgment.

Uniform Foreign-Country Money Judgments Recognition Act § 4, cmt. 12 at 13.

The Seventh Circuit has described due process under the FCMJRA as an "'international concept of due process' to distinguish it from the complex concept that has emerged from American case law." *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000). The court explained,

> It is a fair guess that no foreign nation has decided to incorporate our due process doctrines into its own procedural law; and so we interpret "due process" in the Illinois statute (which, remember, is a uniform act, not one intended to reflect the idiosyncratic jurisprudence of a particular state) to revert to a concept of fair procedure simple and basic enough to describe the judicial processes of civilized nations, our peers.

*Id.* at 476-77; *see also Reinhart*, 402 F.3d at 994 ("The procedures the English courts afford need

not be identical to ours, they must only be compatible in that they do not offend the notion of basic fairness.").

Miller's due process arguments fare no better than his public policy arguments. Miller again points to the hockey tribunal proceeding, arguing that it was fundamentally unfair for the Swiss courts to use that decision against him, both in the criminal proceeding—which determined Miller's civil liability—and in the civil proceeding, which produced the Judgment. As shown above, use of the hockey tribunal decision against Miller was not fundamentally unfair. The hockey tribunal decision was not given preclusive effect in any of the court proceedings, but was simply one piece of evidence that the courts considered. Moreover, Miller could have appealed the hockey tribunal decision, but elected not to do so. Thus, use of that decision as evidence was not contrary to due process.

Miller also complains that he was denied due process in the criminal proceedings, not only because he was denied the opportunity to cross-examine Gerhard Müller, the court-appointed expert, but also because the court rejected Miller's expert opinions out of hand, refusing to accord them the evidentiary status of Gerhard Müller's opinion. Miller's complaints do not concern the specific Swiss proceeding, but instead are an indictment of the Swiss legal system itself, which is not a proper basis for nonrecognition under § 4(c)(8). Miller was not precluded from cross-examining Gerhard Müller because of the judge's particular decision, but because Swiss law does not allow for cross-examination of court-appointed experts. Similarly, the criminal court judge did not reject the opinions of Miller's experts as "evidence" out of bias or an arbitrary application of the court rules, but because Swiss law does not accord the opinions of a party's expert the same status as the opinions of independent court-appointed experts. Therefore, the criminal proceeding did not offend notions of basic fairness.

Finally, Miller contends that he was not afforded due process in the civil proceeding because the judge endorsed the prior criminal decision, which determined Miller's civil liability, relied on the hockey tribunal decision, and cited Gerhard Müller's expert opinion as the primary basis for his finding of liability.  As has already been pointed out, these items were only part of the body of evidence submitted to the civil court judge, which included evidence that Miller himself submitted.  In addition, the civil court judge specifically noted that he was not bound by the criminal court decision, but was permitted to consider the evidence anew.  A review of the Judgment shows that he did so and considered Miller's evidence and arguments.  In sum, the Court cannot say that the Judgment presents a serious injustice or lacks basic fairness, such that nonrecognition is appropriate.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant Allianz's Motion for Summary Judgment, deny Miller's Motion for Summary Judgment, and enter an order recognizing the Judgment.

A separate order and judgment will enter.


Dated:  June 5, 2014                                        /s/ Gordon J. Quist
                                                                                         GORDON J. QUIST
                                                                                    UNITED STATES DISTRICT JUDGE